UNITED STATES BANKRUPTCY COURT

DISTRICT OF NEW MEXICO

In re:

SANDRA JOYCE MCGRATH and Case No. 20-11513-ta13
DALE ALLEN ROGERS,

    Debtors.

## OPINION

Before the Court is a bank's motion for relief from stay so it can complete the foreclosure sale of Debtors' house. The bank argues a number of grounds in support of the motion, including that Debtors' lack standing to object; lack of adequate protection; other "cause," including the inability to confirm a plan; lack of equity/not necessary to a reorganization; and that this case is part of a scheme to hinder or delay the bank. After a trial on the merits, the Court finds that the stay motion should be denied, subject to the condition set out below.

1.    <u>Facts</u>.[1]

    The Court finds:

    Debtors live in Capulin, New Mexico, an unincorporated hamlet in the northeast corner of the state. Mr. Rogers works on a nearby ranch; Ms. McGrath stays home and cares for her young nephews. The family lives in a 1996 Fleetwood mobile home on a residential lot, both of which they own (together, the "House").

    In 2010, Debtors borrowed $44,372.04 at 7.75% interest from InBank. The loan was secured by a first mortgage on the House. Debtors were required to make 59 payments of $417.66, followed by a "balloon" payment of about $35,220.05. In March 2014, Debtors and the bank

---

[1] The Court takes judicial notice of its docket in this case, to consider the contents thereof but not the truth of the matters asserted therein. *Johnson v. Spencer*, 950 F.3d 680, 705 (10th Cir. 2020).

renewed the loan, increasing the principal to $55,949.77 and extending the balloon payment date until March 2019. The House was appraised in 2014, presumably in conjunction with the loan modification, for $74,000.

Debtors are raising two young nephews, born in 2015 and 2018. The younger boy was exposed to methamphetamine in utero.[2] Both are special needs children and require a lot of care and attention. Debtors are seeking to adopt the boys and have made improvements to the House to accommodate them. The older boy attends special needs classes at a school in a nearby town.

Debtors made their monthly payments on the bank loan but could not make the balloon payment in March 2019. For reasons not in the record, the bank declined to renew the loan. In June 2019 the bank brought a foreclosure action. The state court entered a default judgment on September 23, 2019, for $63,329.48, plus post-judgment interest at 19.75%,[3] and ordered the House sold at a foreclosure sale.

Debtors filed a chapter 13 case on October 28, 2019, shortly before the scheduled foreclosure sale. The case was dismissed in June 2020 because Debtors did not file an operating report or produce two state tax returns as ordered by the Court. Debtors filed this chapter 13 case on July 29, 2020. By then Debtors owed the bank $82,577.43.

The House is insured through a policy bought by the bank. It is not clear whether the policy insures Debtor's ownership interest in the House or only the bank's mortgagee interest.

Debtors filed a plan on July 29, 2020, proposing monthly payments of $925 for 36 months. They are current on their plan payments.

---

[2] It seems likely that the older boy's developmental and learning problems also were caused by his mother's drug abuse.
[3] The promissory note specifies a default rate of interest 12% higher than the non-default rate.

-2-

The automatic stay terminated in this case on August 28, 2020, as to Debtors, but not with respect to estate property, including the House. The bank filed the stay relief motion on October 8, 2020.

There is conflicting and unreliable evidence about the value of the House on the petition date, ranging from $45,000 to $110,000. There is no evidence, however, that the House is declining in value.

2. <u>Standing</u>.

The bank argues that because the stay was terminated as to Debtors, they lack standing to object to the stay relief motion. This weak argument fails. The Court discussed principles of standing in *In re Flying Star Cafes, Inc.*, 568 B.R. 129, 133-34 (Bankr. D.N.M. 2017). They can be summarized as follows:

- <u>Article III standing</u>. Article III restricts federal court adjudication to actual cases or controversies. *State of Utah v. Babbitt*, 137 F.3d 1193, 1201 (10th Cir. 1998). To satisfy Article III's standing requirements, a plaintiff must show an injury in fact, causation, and redressability. *Friends of the Earth, Inc. v. Laidlaw Envtl. Servs. (TOC), Inc.*, 528 U.S. 167, 180–81 (2000), citing *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560–61 (1992).
- <u>Prudential Standing</u>. Prudential standing "embodies judicially self-imposed limits on the exercise of federal jurisdiction." *The Wilderness Soc. v. Kane County, Utah*, 632 F.3d 1162, 1168 (10th Cir. 2011). The prudential standing doctrine encompasses various limitations, including "the general prohibition on a litigant's raising another person's legal rights." *Id.,* quoting *Allen v. Wright,* 468 U.S. 737, 751 (1984). "[T]he plaintiff generally must assert his own legal rights and interests, and cannot rest his claim to relief on the legal rights or interests of third parties." *Id.,* quoting *Warth v. Seldin,* 422 U.S. 490, 499 (1975). Prudential standing is an issue of subject matter jurisdiction. *Wilderness Soc.,* 632 F.3d at 1168; *Deutsche bank Nat. Trust Co. v. F.D.I.C.*, 717 F.3d 189, 194 n.4 (D.C. Cir. 2013) (prudential standing is threshold jurisdictional concept).
- <u>Statutory Standing</u>. Sometimes the right to bring a cause of action is conferred by statute. In those cases, prudential standing concepts, which are judge-made, take a back seat. *See, e.g., Lexmark Intern. Inc. v. Static Control Components, Inc.*, 572 U.S. 118 (2014) ("we do not ask whether in our judgment Congress *should* have authorized [plaintiff's] suit, but whether Congress in fact did so.") (emphasis in original).

Applying these principles, Debtors clearly have standing to resist the bank's stay motion. There is an actual case or controversy. They are asserting their own rights, i.e., the right to try to keep the House. The House is necessary to their reorganization (see below). Debtors' standing is not prohibited by any statute. While the trustee clearly has standing also, there is no question that Debtors are the parties most affected by the outcome of the bank's stay motion.

3. <u>Lack of Adequate Protection (§ 362(d)(1))</u>.[4]

A secured creditor

> lacks adequate protection if the value of its collateral is declining as a result of the stay. It must, therefore, prove this decline in value—or the threat of a decline [e.g., the failure to maintain property insurance or keep the property in a good repair]— in order to establish a *prima facie* case.

*In re Elmira Litho*, *Inc.*, 174 B.R. 892, 902 (Bankr. S.D.N.Y. 1994) (citing cases).

There is no evidence that the House is declining in value. Ms. McGrath testified that the House's value is increasing, due to Debtors' ongoing efforts to maintain and improve it. The bank's witness opined that the House had a low value, but not that its value had declined postpetition.

The uncontradicted evidence is that Debtors are not insuring the House. Normally that would be a significant problem, since providing insurance is a typical and important obligation of a residential mortgagor. Here, however, the loan has matured and the loan documents have been superseded by the foreclosure judgement. Debtors' duty to provide insurance to the bank therefore has been extinguished.

The Court concludes that the bank did not present a prima facie case for relief under § 362(d)(1).

---

[4] All statutory references are to 11 U.S.C. unless otherwise indicated.

4. Other "Cause" (§ 362(d)(1)).

   A. Lack of Good Faith.

The bank asks for stay relief based on Debtors' alleged lack of good faith, citing § 362(c)(3)(C). This argument has no merit; the subsection deals with the Court's ability to extend the stay on a second filing, not a creditor's right to relief from the stay. In any event, the Court finds that Debtors filed this case in good faith.

   B. Inability to Confirm a Plan. Relying on § 1322(b)(2), the bank argues that Debtors cannot confirm a plan that allows Debtors to keep the House, so stay relief is appropriate. Section 1322(b)(2) provides:

> (b) Subject to subsections (a) and (c) of this section, the plan may—
> …
> (2) modify the rights of holders of secured claims, other than a claim secured only by a security interest in real property that is the debtor's principal residence, or of holders of unsecured claims, or leave unaffected the rights of holders of any class of claims[.]

The bank's argument overlooks § 1322(c), which states:

> (c) Notwithstanding subsection (b)(2) and applicable nonbankruptcy law—
> …
> (2) in a case in which the last payment on the original payment schedule for a claim secured only by a security interest in real property that is the debtor's principal residence is due before the date on which the final payment under the plan is due, the plan may provide for the payment of the claim as modified pursuant to section 1325(a)(5) of this title.

Finally, Section 1325(a) provides in part that the court shall confirm a plan if:

> (5) with respect to each allowed secured claim provided for by the plan—
> . . .
> (B)(i) the plan provides that—
> (I) the holder of such claim retain the lien securing such claim until the earlier of—
> (aa) the payment of the underlying debt…; or
> (bb) discharge…; and
> (II) if the case under this chapter is dismissed or converted without completion of the plan, such lien shall also be retained…;

(ii) the value, as of the effective date of the plan, of property to be distributed under the plan on account of such claim is not less than the allowed amount of such claim; and
(iii) if—
(I) property to be distributed pursuant to this subsection is in the form of periodic payments, such payments shall be in equal monthly amounts …

Together, the sections provide an exception to the general rule that chapter 13 debtors cannot modify the terms of a residential mortgage. The exception only applies, however, if the mortgage matures before the end of the plan term. That is the case here.

The bank construes § 1325(a) to require equal periodic payments under the plan sufficient to pay its $82,600 claim in full. Debtors admit they likely cannot afford that.[5]

The bank's construction about equal periodic payments has substantial case law support. *See, e.g., Hamilton v. Wells Fargo Bank, N.A.*, 401 B.R. 539, 544 (1st Cir. BAP 2009); *In re Benedicto*, 587 B.R. 573, 576 (Bankr. S.D. Fla. 2018); *In re Miceli*, 587 B.R. 492, 502 n.13 (Bankr. N.D. Ill. 2018); *see also* 8 *Collier on Bankruptcy* ¶ 1325.06[3][b][ii][A]. This construction usually is described as the majority view.

In *In re Cochran*, 555 B.R. 892 (Bankr. M.D. Ga. 2016), however, the court took issue with the reasoning behind this view:

> These courts assume that because a balloon payment occurs as part of, or following, a series of regular payments, it too must be "periodic." The Court disagrees with this conclusion. A balloon payment satisfies the debt in full, and thus by definition cannot be repeated periodically, whether in equal amounts or otherwise.
> Because "periodic" payments are regularly reoccurring and balloon payments are not, balloon payments are not "property to be distributed ... in the form of periodic payments" and, consequently, are outside the scope of § 1325(a)(5)(B)(iii)(I).
> …
> In reaching a contrary conclusion,…some courts overlook the "if" in §1325(a)(5)(B)(iii)(I), assuming that all secured claims must be paid by periodic payments; however, this interpretation renders the "if" superfluous, and goes against legislative history and the more careful analysis rendered by other courts.

---

[5] At 4% interest, the monthly payment needed to pay $82,500 in 60 months is about $1,520.

*Id.* at 898; *see also In re Olsen*, 604 B.R. 790, 804 (Bankr. W.D. Wis. 2019):

> Permitting the balloon payment furthers the policies underlying the Bankruptcy Code. The Code is designed to (1) grant a fresh start to the honest but unfortunate debtor and (2) repay creditors. The balloon achieves both;[6]

*In re Ramirez,* 2014 WL 1466212, at *3 (Bankr. S.D. Fla.) (same); *see generally* Hon. W. Homer Drake, Jr., Hon. Paul W. Bonapfel, & Adam M. Goodman, *Chapter 13 Practice & Procedure* § 5:18 (2016):

> The term 'periodic payments' could be construed to mean regular, recurring payments that are made to reduce a secured claim during the plan's term but not to a final one that completely satisfies it. A regular installment payment or payment of interest on the debt is a 'periodic' one, whereas a lump sum payment is not .... [T]his interpretation of 'periodic payments' accomplishes the primary objective of the new provisions of Code § 1325(a)(5)(B)(iii)....;

Lynn M. LoPucki, *House Swaps: A Strategic Bankruptcy Solution to the Foreclosure Crisis*, 112 Mich. L. Rev. 689, 731 (2014):

> Read literally, this provision does not prohibit balloon payment plans. The provision applies only to plan payments 'in the form of periodic payments.' Had the drafters intended [ ] to prohibit both balloon payments and periodic payments, the drafters would have said 'all plan payments' instead of 'such payments.'

The Court agrees with the interpretation of § 1325(a)(5) in *Cochran* and *Olsen*. There is no requirement in § 1325(a)(5) that all payments to a secured creditor be equal periodic payments. In a "balloon payment" plan, the property to be distributed is part periodic payments and part lump

---

[6] *Accord Credit Acceptance Corporation v. Thompson*, 610 B.R. 595, 602 (Bankr. S.D. Ind. 2019) ("Prior to the amendments to the Bankruptcy Code that included the equal payment provision, it was not uncommon for Chapter 13 plans to provide for backloaded payments to secured creditors, such as balloon payments or graduated step-up payment schedules….Such plans were viewed as unfair or abusive to secured creditors because the value of the collateral was depreciating while they were not being paid, and thus they were exposed to the risk that, if the plan failed, they would be required to repossess collateral that was now worth less than the value of the claim…. However, if secured creditors are adequately protected throughout the duration of the plan…these abusive tactics are not a concern").

sum payment. That is not prohibited by the subsection. The periodic payments have to be equal, per § 1325(a)(5)(B)(iii)(I), but the lump sum payment only has to pay the claim in full.

Under this construction of § 1325(a), Debtors could propose a plan that would make equal periodic payments for 3-5 years, followed by a balloon payment. For example, a $82,600 loan amortized over 30 years at 4% interest would have monthly payments of $394. If Debtors proposed a plan with this payment structure, combined with a "balloon" payment at the end of the plan, it would comply with §§ 1322 and 1325(a).

Furthermore, it may be permissible for Debtors to bifurcate the bank's claim. *See, e.g., Hurlburt v. Black*, 925 F.3d 154, 167 (4th Cir. 2019) (overruling a prior Fourth Circuit holding, the court ruled that chapter 13 debtors have the right to bifurcate mortgage loans that mature before the end of the plan period); *In re Collier-Abbott*, 616 B.R. 117, 123 (Bankr. E.D. Cal. 2020) (same); *In re Schroeder*, 607 B.R. 329, 333 (Bankr. E.D. Wis. 2019) (same); *In re Olmo-Claudio*, 2017 WL 3835798, at *4 (Bankr. E.D.N.Y.) (same). Under this case law, if the bank is correct that the House is only worth $45,000, Debtors could propose a plan that amortizes $45,000 over five years, with a balloon payment thereafter, and treats the balance of the bank's claim as a general unsecured claim.

Based on the foregoing, the Court overrules the bank's argument that it is entitled to stay relief pursuant to § 362(d)(1)'s "cause" provision.[7]

---

[7] Debtors are going to have to amend their chapter 13 plan, which is not confirmable in its current form.

5. No Equity/Not Necessary for Reorganization (§ 362(d)(2)).

The bank next argues that Debtors have no equity in the House and that the House is not necessary to Debtors' reorganization.[8] Debtors counter that the House is worth more than the bank debt and that they need to keep it because its layout and location help them raise their special needs nephews.

The only expert opinion on value is a 2014 appraisal, about which the bank officer testified in her direct examination. That value was $74,000. Debtors valued the House at $85,000 in their schedules. At trial, the bank officer opined that the House was only worth $45,000, while Ms. McGrath opined it was worth $110,000. Given the weakness and inconsistency of this valuation evidence, the Court will not make a finding about the House's value, but will assume that there is no equity in the House.

Whether or not there is equity, it is clear that the House is necessary to Debtors' reorganization. Although the bank probably is correct that there are other housing options in the Capulin area, that is not the test. Rather, if chapter 13 debtors own a house and want to keep it, courts have held that the house is necessary to their reorganization. *See, e.g., In re Brown*, 606 B.R. 348, 354 (Bankr. E.D. Ark. 2019) (most courts have held that a debtor's residence is necessary for an effective reorganization); *In re Ramos*, 357 B.R. 669, 672 (Bankr. S.D. Fla. 2006) (same; citing cases); *In re Smith*, 245 B.R. 622, 624–25 (Bankr. W.D. Mo. 2000) (same); *In re Parks*, 193 B.R. 361, 364 (Bankr. N.D. Ala. 1995) (same); *In re Elmore*, 94 B.R. 670, 677 (Bankr. C.D. Cal. 1988) ("A debtor's principal residence in a Chapter 13 case is virtually always necessary to an effective reorganization"); *see also In re Jones*, 119 B.R. 996, 1005 (Bankr. N.D. Ind. 1990)

---

[8] Under § 362(d)(2), a creditor is entitled to stay relief if there is no equity in its collateral *and* the collateral is not necessary to an effective reorganization.

(debtor's car was necessary, even if he could get something cheaper). With a "save the house" chapter 13 case, it is hard to see how the house is not necessary to the reorganization.

Here, Debtors own an extremely modest mobile home in Capulin. They need the House because it gives them a place for them to live and raise their boys. They like the House and want to keep it. It's in a good location for Mr. Rogers to get to work and the older nephew to attend his special needs classes. This case is a quintessential "save the house" case. The Court finds that the House is necessary to Debtors' reorganization. For that reason, the bank is not entitled to stay relief under § 362(d)(2).

6. <u>Single Asset Real Estate (§ 362(d)(3))</u>.

Next, the bank cites § 362(d)(3) in support of it request for stay relief. That subsection only applies to single asset real estate debtors, which Debtors are not, so the argument is meritless.

7. <u>Scheme to Hinder, Delay, or Defraud the bank (§ 362(d)(4)(B))</u>.

Finally, the bank asks for stay relief under § 362(d)(4)(B), alleging that Debtors have filed multiple bankruptcies as part of a scheme to hinder, delay, or defraud it.

> Before a court will lift the automatic stay [under this subsection], it must find that (1) the debtor's bankruptcy filing was part of a scheme; (2) the scheme was intended to delay, hinder or defraud the creditor; and (3) the scheme involved either (a) the transfer of some interest in the real property without obtaining approval from the court or the secured creditor, or (b) multiple bankruptcy filings affecting the real property.

*In re Tejal Inv., LLC*, 2012 WL 6186159, at *5 (Bankr. D. Utah.); citing *In re Lee*, 467 B.R. 906, 920 (6th Cir. BAP 2012). The bank bears the burden of proving all three elements. *Id.*; *see also* 3 *Collier on Bankruptcy* ¶ 362.05[19][a].

The Court finds that this bankruptcy case is not part of a scheme and that Debtors have no intent to hinder, delay, or defraud the bank. Debtors' first case was dismissed for failure to comply with a court order. While they were derelict in their first case, there is no evidence that Debtors'

-10-
Case 20-11513-t13    Doc 63    Filed 12/23/20    Entered 12/23/20 15:56:51 Page 10 of 11

motives were bad, i.e., to hinder or delay the bank. Debtors have prosecuted this case diligently and have made their plan payments. They are good, upright people and the Court finds that they intend to pay the bank what the Bankruptcy Code requires.

Furthermore, Debtors filed *one* other case. That compares favorably to *In re Smith*, 395 B.R. 711, 714–17 (Bankr. D. Kan. 2008), for example, where the debtor filed six bankruptcy cases in five years. It is not clear to the Court that a second case comes within the definition of "multiple bankruptcy filings." *See Merriam-Webster's Ninth Collegiate Dictionary* (multiple is defined as "something in units of more than one or two").

The Court concludes that the bank is not entitled to relief under § 362(d)(4)(B).

## Conclusion

Debtors filed this second chapter 13 case to save the House. Although second filings are scrutinized with a somewhat jaundiced eye, Debtors have shown that they are serious about paying the bank while keeping their House and reorganizing their debts. Debtors could file a plan that has a likelihood of confirmation. The House is not declining in value and is necessary for Debtors' reorganization. This case was filed in good faith and not as a scheme to hinder or delay the bank. The bank is not entitled to stay relief under § 362(d), so its motion will be denied, subject to the condition that Debtors file an amended plan consistent with this opinion by January 15, 2021.

_____
Hon. David T. Thuma
United States Bankruptcy Judge

Entered: December 23, 2020
Copies to: Counsel of record